**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
ELKINS**

**UNITED STATES OF AMERICA,**

Plaintiff**,**

**v.**                                                                    **Case No.:   2:17-CR-15-02
                                                                          (JUDGE BAILEY)**

**ROCKY DOUGLAS IDLEMAN,**

Defendant.

## REPORT & RECOMMENDATION

Before the undersigned are Defendant Rocky Idleman's "Motion to Suppress," filed on April 12, 2018, (ECF No. 567), and the Government's response in opposition filed April 25, 2018. (ECF No. 581); as well as Idlelman's motion for a bill of particulars (ECF No. 562) and the Government's response in opposition (ECF No. 578). On April 27, 2018 came Idleman, in person and by counsel Belinda Haynie, Esq., and the Government, by Assistant United States Attorney Stephen Warner, for a hearing on the motions.

### Defendant's Motion for a Bill of Particulars

The parties first addressed Idleman's motion for a bill of particulars (ECF No. 562). Idleman's counsel explained that there appeared to be no overlap between the persons and acts identified in the Conspiracy Count (1), and those identified in Counts 33 and 20-23. Moreover, the time period alleged is very broad, and during which Idleman was, for portions of time, incarcerated. As a result, Idleman argued that more details were needed in order to determine what specific overt acts support the conspiracy allegation, and to prepare an adequate defense.

The Government advised the Court that all of the information Idleman seeks was included in discovery provided to Idleman's previous counsel by email, along with a list indicating where specific evidence relating to Defendant Idleman and his charges can be found. Defense Counsel advised she had reviewed the email in question, but questions remained. The Government advised that there is no additional evidence on this point that has not been disclosed and, therefore, no additional particulars to provide.

Pursuant to the Federal Rules of Criminal Procedure, this court may direct the Government to file a bill of particulars. Fed. R. Crim. P. 7(f). Whether a motion for bill of particulars should be granted or denied is a matter within the sound discretion of the trial court. United States v. Schembari, 484 F.2d 931, 934 (4th Cir. 1973). "A bill of particulars identifies for the defendant the area within which the government's chief evidence will fall[, and] . . . its purpose 'is to fairly apprise the defendant of the charges against him so that he may adequately prepare a defense and avoid surprise at trial . . . not . . . to provide detailed disclosure of the government's evidence in advance of trial.'" United States v. Fletcher, 74 F.3d 49, 53 (4th Cir. 1996), quoting United States v. Automated Medical Labs., Inc., 770 F.2d 399, 405 (4th Cir. 1985) (citation omitted)); see also Schembari, 484 F.2d at 934-35. A bill of particulars "amplifies the indictment by providing missing or additional information so that the defendant can effectively prepare for trial." Id., citing United States v. Howard, 590 F.2d 564, 567 (4th Cir. 1979), cert. denied, 440 U.S. 976 (1979).

In addition, when "the Government [has] provided [a defendant] with full discovery," it is a "discovery issue," and a bill of particulars is properly denied. United States v. Najera, 585 Fed. App'x. 185 (4th Cir. 2014) (per curiam). The undersigned advised Defense Counsel that, to the extent she may feel that the evidence is insufficient, such arguments can always be made at the appropriate time. As to the bill of particulars, however, the Government has represented that

2

full discovery has been made and will continue to be made as any additional evidence is obtained, and there are no additional "particulars" to provide. Accordingly, the undersigned finds that this is an issue for discovery, and Defendant's motion for a bill of particulars is **DENIED.**

### Defendant's Motion to Suppress Evidence from the "Ohio [Traffic] Stop"

Turning next to Idleman's motion to suppress, the Court heard testimony from Sgt. Kurt Beidelschies, with the Ohio State Highway Patrol ("OSHP"), of his account of the traffic stop occurring on August 9, 2017. (ECF No. 635 at 21 - 57). Subsequently, on May 5, 2018, Idleman filed a "Supplement to Previously Filed Motion to Suppress" (ECF No. 588); on May 9, 2018, the Government filed a supplemental response in opposition. (ECF No. 595). Accordingly, this motion is now ripe for a report and recommendation to the District Judge.

The undersigned recommends that Idleman's motions be **DENIED** as to all claims except Idleman's statement denying ownership of the locked box in the vehicle, for the reasons explained below.

### I.     FACTUAL BACKGROUND

Idleman was charged by superseding indictment on December 19, 2017 with conspiracy to distribute more than 50 grams of methamphetamine in violation of 21 U.S.C. §§ 841(a)(1), 846, and 841(b)(1)(A); distribution of methamphetamine in violation of 21 U.S.C. § 841(a)(1) and 841(b)(C); and three (3) counts of unlawful possession of a firearm, in violation of 18 U.S.C. §§ 922(g)(1), 924(a)(2), and 924(c)(1)(A). (ECF No. 391 at 2, 21-24).

On August 9, 2017, Sgt. Beidelschies was parked in the "crossover," or median, of Interstate 70 ("I-70"), approximately 45 minutes west of Columbus, Ohio, on patrol. Sgt. Beidelschies was able to see at a distance in either direction because that three-lane stretch of I-70 was "very long and very straight." From about a mile to a half-mile away, Sgt. Beidelschies observed a silver Toyota Camry following approximately one-and-a-half car lengths behind a

tractor-trailer. As the Camry passed him, Sgt. Beidelschies initiated a traffic stop for the offense of "following too close[ly]" in violation of Ohio Revised Code § 4511.34. (ECF No. 584 at 1). Sgt. Beidelschies ran the license plate through dispatch, who reported nothing amiss with the registration. Sgt. Beidelschies then approached the Camry, and found the driver, Idleman; and a female passenger (identified at the hearing as a Ms. Herron). (ECF No. 635 at 21-26).

When Sgt. Beidelschies explained the reason for the stop, Idleman generally agreed he was following the tractor trailer at a distance of approximately one and a half car lengths, though Sgt. Beidelschies noted that Idleman did not appear to know that was a violation of Ohio law. Idleman could not produce a driver's license or a vehicle registration. Per standard protocol, Sgt. Beidelschies had Idleman exit the Camry, patted him down for weapons, and had him sit in the front seat of the patrol car while Sgt. Beidelschies ran Idleman's name and date of birth through dispatch. [1] Idleman was compliant. Noticing a large bandage on Idleman's hand, Sgt. Beidelschies asked what had happened; Idleman responded he had recently been shot. While seated in the patrol car, dispatch notified Sgt. Beidelschies that there was a felony warrant for Idleman's arrest. Sgt. Beidelschies requested a backup officer to assist with the felony warrant.[2] (ECF No. 635 at 27-29).

During the estimated three-to-five minute wait for backup to arrive, Sgt. Beidelschies asked Idleman about his travels. Idleman said he was driving to New Jersey from Indianapolis to visit family. Idleman could not initially recall the name of his female passenger; eventually, he

---

[1] Sgt. Beidelschies advised it is standard practice/protocol at OSHP when a driver has no identification/driver's license for him to exit the vehicle and wait in the patrol car until identity and license validity can be investigated and confirmed.

[2] Sgt. Beidelschies explained that for officer safety reasons, it is standard practice and protocol for a lone officer to wait for backup before taking any adverse acts that may escalate a situation. Sgt. Beidelschies also noted that Idleman was "not a small man," and he was neither cuffed nor restrained at that point. In addition, Sgt. Beidelschies was also waiting for dispatch to report back after speaking to the issuing agency to confirm the warrant.

recalled her name was Erica. Sgt. Beidelschies noted that Idleman appeared "very nervous." (ECF No. 635 at 29-30).

Shortly after Trooper Michael Rucker arrived, dispatch confirmed the validity of the felony warrant. Idleman was asked to step out of the patrol car, informed of the felony warrant, placed in handcuffs, and secured in the back seat of the patrol car.[3] (ECF No. 635 at 50). Sgt. Beidelschies then asked Trooper Rucker to deploy his canine ("K9") dog to conduct a sniff around the Camry, based on Idleman's apparent nervousness, recent gunshot wound, and not knowing the name of his passenger (Herron). As Trooper Rucker was walking to his vehicle to get the K-9, Sgt. Beidelschies approached Herron and directed her to step out of the vehicle. As Sgt. Beidelschies opened the passenger door, he saw the muzzle of a handgun and a metal pipe used for smoking marijuana under the passenger seat. At this point, Herron was placed in handcuffs and secured in Trooper Rucker's patrol car. The intended K9 search was never conducted, because the handgun and marijuana pipe were in plain view; Sgt. Beidelschies considered himself to be investigating a potential felony crime. Sgt. Beidelschies then retrieved the handgun (a Glock) and a plastic bag of bullets from underneath the passenger seat. The officers then searched the remaining passenger floor area of the Camry. A loaded Luger 9 millimeter handgun was also found in a woman's purse on the passenger floor.

While Sgt. Beidelschies was securing the handguns, a third officer - Trooper Williamson - arrived on scene to assist. The officers searched the entire vehicle, including the glove compartment and containers within the vehicle.  A glass pipe used to smoke methamphetamine was found under the driver's seat. A locked box was found on the floor in front of the driver's

---

[3] Idleman was not given Miranda warnings at that time, as the officers were not conducting formal questioning of Idleman at that point. Sgt. Beidelschies explained that the Ohio State Highway Patrol has officers in a specialized Investigations Unit that will come out to conduct questioning when necessary following a traffic stop, so that the patrol officers can remain on task patrolling the highway. (ECF No. 635 at 50).

seat. The officers asked both Idleman and Herron if they had a key to the box; both denied ownership of the box. The officers forced the box open and found a "gray, drug-esque substance," small glassine envelopes commonly used in narcotics distribution, a narcotics ledger, and $5,000.00 in cash. While the officers were searching the Camry, Idleman - who was by himself in the patrol car – said out loud, "God damn, I just lost my whole load."[4]

Sgt. Beidelschies noted that the evidence list for this stop was "extensive," and more items were found in the trunk of the Camry. Idleman's information was also run through the Ohio State Highway Patrol's Criminal Intelligence Unit, which returned a recent arrest in West Virginia. Sgt. Beidelschies was given contact information for a local ATF agent, who advised that Idleman was the subject of a current, ongoing investigation.

Accordingly, at the conclusion of the traffic stop, Herron was turned over to the ATF. Idleman was taken to a nearby facility in West Jefferson, Ohio, where Officers Frost and Gray with the Ohio State Highway Patrol Investigations Unit gave Idleman Miranda warnings and questioned him. It was here that Idleman apparently stated that he "didn't have a version," and that he "was just told to drive the car." Idleman was then taken to Tri-County Regional Jail and held on the felony warrant detainer. The Camry was impounded; the evidence seized was turned over to the ATF.

## II.    THE PARTIES' CONTENTIONS

In his motion and supplemental motion to suppress, Idleman argues, in summary, that:

1.    Evidence and statements obtained as a result of the Ohio stop should be suppressed on Fourth Amendment grounds as fruit of the poisonous tree because:

    a.    Sgt. Beidelschies lacked probable cause to pull the Camry over;

---

[4] The fact that Idleman made this statement was not known to Sgt. Beidelschies until later, when he was reviewing the in-car audio recording from the stop in preparation for a hearing. (ECF No. 635 at 54-55).

      b.      The officers lacked reasonable suspicion to search the Camry;

      c.      The officers lacked reasonable suspicion to search inside the locked box;

      d.      The officers lacked or reasonable suspicion to search inside the trunk;

      (ECF No. 567); and that:

2.      Any statements made by Idleman should also be suppressed on Fifth Amendment grounds because Idleman was not read his Miranda rights when taken into custody. (ECF No. 588).[5]

---

[5]  The legal argument provided by Idleman in support of his motion is less than two pages long, and in its entirety, is that:

> 10. The Fourth Amendment provides that "[t]he right of people to be secure in their persons houses, papers, and effects, against unreasonable searches and seizures, shall not be violated…." U.S. Const. Amend. IV. Warrantless searches are per se unreasonable under the Fourth Amendment, subject to only a few specifically established and well delineated exceptions." *Katz v. Unites States*, 389 U.S. 347, 357 (1967).
>
> 11. "Because a traffic stop is more analogous to an investigative detention than a custodial arrest, [the Fourth Circuit] treat[s] a traffic stop, whether based on probable cause or reasonable suspicion, under the standard set forth in Terry v. Ohio, 392 U.S. 1 (1968)" *United States v. Digiovanni*, 650 F.3d 498, 506 (4th Cir. 2100). The observation of a traffic violation "provides sufficient justification for a police officer to detain the offending vehicle for as long as it takes to perform the traditional incidents of a routine traffic stop." *United States v. Branch*, 537 F.3d 328, 335 (4th Cir. 2008).
>
> 12. However, reasonable suspicion is demonstrated when an officer is able to "point to 'specific and articulable facts which, taken together with rational inferences from those facts, evince more than an inchoate and unparticularized suspicion or hunch of criminal activity." *United States v. Branch*, 537 F.3d 328, 336 (4th Cir. 2008) (quoting *Terry*, 392 U.S. at 27, 88S.Ct. 1868).
>
> 13. Sgt. Beidelschies did not have probable cause to stop the vehicle, nor did he have reasonable suspicion to search the vehicle and it's [sic] contents. "The driver's consent or reasonable suspicion of a crime is necessary to extend a traffic stop for investigatory purposes. In order to demonstrate reasonable suspicion, a police officer must offer "specific and articulable facts" that demonstrate at least "a minimal level of objective justification" for the belief that criminal activity is afoot. *Wardlow*, 528 U.S. at 123, 120 S.Ct. 673; *Terry*, 392 U.S. at 21, 88 S.Ct. 1868. Judicial review of the evidence offered to demonstrate reasonable suspicion must be commonsensical, focused on the evidence as a whole, and cognizant of both context and the particular experience of officers charged with the ongoing tasks of law enforcement." *U.S. Branch* [sic], 537 F.3d 328, 337 (4th Cir., 2008).
>
> 14. Furthermore, the Ohio State Troopers did not obtain a search warrant to search the contents of the lock box or the trunk of the vehicle, nor can the trooper articulate factors which gave him reasonable suspicion to search the vehicle. Sgt. Beidelschies' decision to search was clearly made prior to locating any contraband and was not based upon any specific or articulable facts which would demonstrate that criminal activity was afoot. Wherefore, Counsel for the Defendant would move this Honorable Court for an order suppressing at trial all evidence of and from the "Ohio Stop".

(ECF No. 567 at 4-5). As a result of the brevity and lack of specificity, the Court addresses each argument as best it can be ascertained.

The Government argues that:

1. There was probable cause to pull the Camry over; further, "Idleman admits in his motion that the stop was for the offense of following to close and he does not allege any facts about an illegal stop;"

2. The search of the Camry and its contents was "appropriately conducted pursuant to the vehicle exception" to the Fourth Amendment's warrant requirement;

3. Because the Camry was impounded, an independent basis to search the vehicle and its contents was also available via the inventory search exception to the Fourth Amendment's warrant requirement; (ECF No. 581), and that:

4. It objects to Idleman's motion to suppress the statement "God damn, there goes my whole load," but will not use the statements "I don't have a version," and that "[Idleman] was only told to drive the car" at trial. (ECF No. 595).

## III.    ANALYSIS

Detaining persons during a traffic stop by the police, even briefly and for a limited purpose, is a "seizure" under the Fourth Amendment. Whren v. United States, 517 U.S. 806, 809–10, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1994). "Because a traffic stop is more analogous to an investigative detention than a custodial arrest, [the Fourth Circuit] treat[s] a traffic stop, whether based on probable cause or reasonable suspicion, under the standard set forth in Terry v. Ohio, 392 U.S. 1 (1968)." U.S. v. Digiovanni, 650 F.3d 498, 506 (4th Cir. 2010). The first prong is "whether the police officer's action was justified in its inception." U.S. v. Rusher, 966 F.2d 868, 875 (4th Cir. 1992). The second prong is "whether the police officer's subsequent actions were reasonably related in scope to the circumstances that justified the stop." Id. If the occupants of a vehicle are detained *beyond* the scope of a routine traffic stop, the officer must be able to articulate "reasonable suspicion that criminal activity is afoot." U.S. v. Brugal, 209

F.3d 353, 357 (4th Cir. 2000) (en banc), quoting Rusher. It is the Government's burden to demonstrate that seizure it seeks to justify on basis of reasonable suspicion was sufficiently limited in scope and duration to satisfy conditions of investigative seizure. Florida v. Royer, 460 U.S. 491, 103 S.Ct. 1319 (1983).

The undersigned finds no Fourth Amendment violations occurred during the stop, and accordingly finds no Fourth Amendment grounds for suppression of any evidence or statements, for the following reasons.

**1.      Idleman's Fourth Amendment rights were not violated at any point during the traffic stop, which was lawful in its entirety.**

In his motion, Idleman argues that "Sgt. Beidelschies did not have probable cause to stop Mr. Idleman's vehicle." (ECF No. 567 at 3). Beyond that assertion, however, Idleman did not elaborate further as to *why* he believes probable cause for the stop was lacking, nor did he deny that he was following as closely as alleged. Indeed, as the Government noted in its response, "Mr. Idleman admits that the stop was for the offense of following too close[ly] and he does not allege any facts about an illegal stop." (ECF No. 581 at 2). Nor is a lack of probable cause apparent to the undersigned, for the reasons explained below.

**a.      The traffic stop was justified in its inception because Sgt. Beidelschies observed a traffic violation providing probable cause to stop the Camry.**

"Observing a traffic violation provides sufficient justification for a police officer to detain the offending vehicle for as long as it takes to perform the traditional incidents of a routine traffic stop." U.S. v. Branch, 537 F.3d 328, 335 (4th Cir. 2008) citing Illinois v. Caballes, 369 F.3d 776, 407 (2005). Under the first prong of the Terry inquiry, whether the law enforcement action was 'justified in its inception' hinges on whether the officer observed a traffic violation

sufficient to initiate the stop. Here, Sgt. Beidelschies did. Ohio Revised Code § 4511.34 ("Space between moving vehicles") provides, in relevant part, that a driver of a vehicle "shall not follow another vehicle . . . more closely than is reasonable and prudent, having due regard for the speed of [the] vehicle . . . and the traffic upon and the condition of the highway." Ohio Rev. Code Ann. § 4511.34(A).

Section 4511.34's "safe and prudent distance" requirement is question of whether there is sufficient distance between vehicles for a driver to stop "'in time' [to avoid a collision with the vehicle in front of it, given] the person's speed, the distance at which he followed, and his reaction time." State v. Gonzalez, 43 Ohio App.3d 59, *62, 539 N.E.2d 641, **644 (6th Dis. Wood County 1987) citing State v. Bush (C.P.1962), 88 Ohio Law Abs. 161, 165, 182 N.E.2d 43, 46 ("Bush I"), affirmed in State v. Bush (App.1962), 92 Ohio Law Abs. 63, 28 O.O.2d 353, 193 N.E.2d 195 ("Bush II").  "In the offense of following too closely the element of distance travelled during the *driver's reaction time* is often the key." Bush I, 182 N.E.2d at *46 (emphasis in original). As a result, although road conditions can affect the calculus, "one can still be traveling too close to the vehicle in front of him even while traveling at a legal speed, upon a clear and unobstructed roadway, and in ideal weather conditions." Gonzalez, 43 Ohio App.3d 59 at *62.

Sgt. Beidelschies testified that it is taught at academy, and is the policy and practice of the OSHP, to consider "reasonable and prudent" to be one-and-a-half car lengths for every ten (10) miles per hour. However, this policy is also supported by Ohio case law. State v. Meza, 2005 WL 635028 (Ohio App.2005) (concluding that state trooper had probable cause to believe that the defendant was violating § 4511.34, because he was driving his car on the Ohio Turnpike one and one-half car lengths behind the car in front.).

Sgt. Beidelschies agreed on cross-examination that he could not state with complete certainty the *precise* speed at which Idleman was traveling, as he was not using a speed-measuring device such as radar. However, Sgt. Beidelschies testified that the vehicles were traveling "at approximately the posted speed limit of 70 miles per hour," an estimation based on his clear visual observation of the vehicles for at least half a mile and for at least 30 seconds. Sgt. Beidelschies testified that in order to maintain his electronic speed measuring device certification, he is required to pass yearly visual speed estimation tests, which he has done for the twelve years he has been so employed. (ECF No. 635 at 53). Moreover, Idleman has not disputed that he was traveling at the 70-mile-per-hour speed limit, nor argued that he was traveling at a different speed. Idleman has likewise not disputed that he was following at a distance of one-and-a-half car lengths, nor argued a different following distance. Although defense counsel questioned Sgt. Beidelschies about his visibility and speed estimation, no evidence at the hearing would compel any alternative finding.[6]  As a result, the undersigned finds Idleman was traveling at approximately 70 miles per hour, and that he was following the tractor-trailer at a distance of one-and-a-half car lengths.

Notably, even if he was not, it would hardly affect the outcome. In considering challenges to charges of following too closely under § 4511.34, "the appellate courts of [Ohio] and other states permit courts to take judicial notice that the reaction time of the average man is about three quarters of a second, Ashbrook v. Cleveland Ry. Co., Ohio App., 34 N.E.2d 992, 994 (8th District); Wiebe v. Seely, 215 Or. 331, 335 P.2d 379, 395; Vietmeier v. Voss, Mo., 246 S.W.2d 785, 788. Bush I, supra, 88 Ohio Law Abs. at 166, 182 N.E.2d at 47," and "judicial

---

[6] Sgt. Beidelschies testified on cross examination that Idleman was traveling in the center lane of a three-lane highway; that the traffic that day was typically light and no cars obscured his view of the Camry; that he was able to see at a distance of at least half a mile to a mile into the distance because that portion of I-70 was very flat and very straight; and that the Camry driven by Idleman was in his clear and unobstructed view for at least 30 – 45 seconds.

notice of the fact that a vehicle travels approximately 14.67 feet per second for every ten miles per hour velocity." Gonzalez, 43 Ohio App.3d at *62. Therefore, if Idleman was traveling at approximately 70 miles per hour at a distance of one-and-a-half car lengths behind the tractor-trailer, that distance was not reasonable and prudent within the meaning of § 4511.34.[7] Following one and one-half car lengths behind another vehicle would grant a state trooper "probable cause to believe that a traffic violation had occurred and probable cause to make the stop. Meza at *5.

Accordingly, the traffic stop was justified in its inception because Sgt. Beidelschies had probable cause to stop Idleman for following too closely in violation of Ohio Revised Code § 4511.34(A).

> **b. The OHSP Officers' subsequent actions were reasonably related in scope to the circumstances of the stop because Sgt. Beidelschies was diligently pursuing the seizure's mission, and the duration of the stop was not measurably extended beyond those tasks.**

The "tolerable duration [of a stop] is determined by the seizure's 'mission,' which is to address the traffic violation that warranted the stop, Illinois v. Caballes, 543 U.S. 405, 407, 125 S.Ct. 834, 160 L.Ed.2d 842 and attend to related safety concerns." Rodriguez v. United States, 135 S.Ct. 1609, 1611, 191 L.Ed 492 (2015) (emphasis added). "An officer may engage in 'ordinary inquiries incident to' the traffic stop, such as inspecting a driver's identification and

---

[7] Determined as follows:

> 14.67 feet per second for every ten miles per hour velocity (14.67 x 7) = 102.69 feet per second at 70 mph
> 102.69 x .75 = 77.02 feet per ¾ second (average reaction time)
> 102.69 x .50 = 51.35 feet in half of a second (quicker than average reaction time)

The undersigned also notes that, according to the manufacturer, a Toyota Camry is approximately 16 feet long. See "2018 Camry Full Specs," Toyota.com (accessed July 9, 2018 at https://www.toyota.com/camry/features/dimensions /2550/2514/2532).

As such, a distance behind the tractor-trailer of one-and-a-half car lengths, or approximately 24 feet, was not reasonable and prudent because the Camry would travel, approximately, *at least* 51 feet in half a second – more than twice the distance between Idleman and the tractor-trailer. Indeed, for Idleman's following distance to be reasonable and prudent, he would have had to have been traveling at approximately 30 miles per hour, which is entirely outside the realm of plausibility on I-70.

license to operate a vehicle, verifying the registration of a vehicle and existing insurance coverage, and determining whether the driver is subject to outstanding warrants." U.S. v. Hill, 852 F.3d 377, 382, (4th Cir. 2017) quoting Rodriguez, 135 S.Ct. at 1615. All of this, Sgt. Beidelschies permissibly did.

When an outstanding felony warrant for Idleman's arrest was discovered during the routine incidents of the traffic stop, the mission of the stop expanded beyond the traffic violation to also include taking Idleman into custody. However, apart from brief cross-examination of Sgt. Beidelschies at the hearing that (as best the Court can interpret) may have been intended to imply Ms. Herron should have been allowed to drive the Camry away once Idleman was in custody without a search of a vehicle, (ECF No. 635 at 43), Idleman failed to articulate any specific arguments as to undue delay or deviation from the missions of the stop; nor does he cite any case law that would support such a proposition. However, even if he had explicitly raised such arguments, they would fail.[8]  Rather, Idleman argues that "Sgt. Beidelschies' decision to search was clearly made prior to locating ay contraband and was not based on any specific or articulable facts which would demonstrate that criminal activity was afoot." (ECF No. 567 at 5).

Idleman's first claim here, even if true, is of no consequence - officers' subjective states of mind are irrelevant to the inquiry. Whren, 517 U.S. at *806 ("this Court's cases foreclose the argument that ulterior motives can invalidate police conduct justified on the basis of probable

---

[8] "[O]nce a motor vehicle has been lawfully detained [even] for a minor traffic violation, the police may order the driver to get out of the vehicle without violating the Fourth Amendment's proscription of unreasonable searches and seizures." Ohio v. Robinette, 519 U.S. 33. 38-39 (1996). "[A]n officer making a traffic stop may order passengers to get out of the car pending completion of the stop, even without reasonable suspicion that the passenger poses a safety risk." Maryland v. Wilson, 519 U.S. 408, 415, 117 S.Ct. 882, 886 (1997). Moreover, as established by the Supreme Court in Arizona v. Johnson, 555 U.S. 323, 324, 129 S.Ct. 781, 783 (2009), and recently reiterated by this Court in United States v. Chiles, a passenger of a lawfully stopped vehicle is not free to depart the stop before law enforcement officers release her merely because she had no involvement in the traffic violation giving rise to the stop. 2018 WL 1774556 at 8, Crim. No. 1:18-CR-7-1, ECF No. 68 (N.D.W.Va. Apr. 11, 2018), adopted in 2018 WL 1774557, ECF No.  (N.D.W.Va. Apr. 13, 2018). Nor are law enforcement officers under any obligation "[under] the Fourth Amendment to give [a passenger] an opportunity to depart without first ensuring that, in so doing, [officers are] not permitting a dangerous person to get behind [them]." Johnson, 555 U.S. at 324, 129 S.Ct. at 783.

cause . . . Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis.") (internal citation omitted).

Idleman's second claim, on the other hand, cannot be reconciled with the facts or relevant case law; nor can the undersigned agree with its conclusion. First, while waiting to take Idleman into custody, Sgt. Beidelschies did not decide to *search* the Camry; he decided to conduct a *K9 sniff* of the vehicle. Those two things are not interchangeable; it is well established that a K9 sniff of a vehicle is not a search within the meaning of the Fourth Amendment. Illinois v. Caballes, 543 U.S. 405, 409, 125 S.Ct. 834, 838 (2005) ("the use of a well-trained narcotics-detection dog ... during a lawful traffic stop generally does not implicate legitimate privacy interests" protected by the Fourth Amendment). As a result, reasonable suspicion of criminal activity is only required to justify continued *detention* to conduct a K9 sniff, when doing so measurably extends the duration of the stop beyond the time reasonably necessary to complete the stop.

This particular inquiry frequently arises when defendants are detained past the conclusion of the stop in order for a K9 unit to arrive on scene. See, e.g., Rodriguez, 135 S.Ct. 1609; United States v. Williams, 808 F.3d 238 (4th Cir. 2015). However, a stop cannot be delayed in order to wait for a K9's arrival when the K9 is already on scene before the stop concludes. United States v. Hill, 852 F.3d at 384 (presence of K9 "contemporaneous with the officers' diligent pursuit of the mission" permissible, contrasting Rodriguez' finding of unlawful extension of a stop "seven or eight minutes after the purpose of the traffic stop was complete"). The determinative question is not whether the dog sniff occurs before or after a citation is written under Rodriguez, but whether the sniff *unreasonably* prolongs the detention after it should reasonably have concluded.

Here, there is no dispute that Trooper Rucker and his K9 arrived on scene prior to Idleman being taken into custody. The stop was not extended in order to give the K9 time to

arrive on scene; rather, the slight three to five minute delay in Trooper Rucker's arrival was for him to assist Sgt. Beidelschies as backup so that Idleman could be safely taken into custody without any unnecessary risk to Sgt. Beidelschies' safety. The fact that a K9 happened to be with Trooper Rucker, while unfortunate for Idleman, does not negate the valid reasons Sgt. Beidelschies had for waiting for backup before arresting Idleman - particularly given that Idleman was "not a small man," he had an outstanding felony warrant for his arrest, and was not secured in any way at that point. Moreover, the occupants of the Camry outnumbered Beidelschies two to one; Sgt. Beidelschies could not simultaneously monitor Herron while also taking Idleman into custody.[9] Sgt. Beidelschies was thus permissibly "atten[ding] to related safety concerns" tied to the stop in awaiting the arrival of a backup officer for approximately three to five minutes before taking Idleman into custody. Rodriguez, 135 S.Ct. at 1611.

The only remaining question is therefore whether the amount of time between Idleman's arrest and Sgt. Beidelschies observation of the gun and drug pipe in plain view constituted an "unreasonable" delay that "prolonged" the stop. Here, it did not. Although the precise amount of time is not known, Sgt. Beidelschies testified that:

> Q.    Once you had him officially arrested, in your cruiser, in the backseat, what did you do?
>
> A.    . . . [A]fter I placed him in the backseat of my police car, I asked Trooper Rucker, who is a canine handler, to get his dog out, to deploy it around the exterior of their passenger car, which was my intention to do next. While he was walking to his patrol car . . . I walked back up to Mr. Idleman's car and I explained to his passenger, you know, he's got a warrant for his arrest. I'm going to need you to hop out because we're going to walk a dog around your car . . .
>
> Q.    What happened next?
>
> A.    I opened the door to have her exit. She said she'd exit. I opened the door to have her exit. When I opened the door, when I looked down underneath the passenger seat, I could see the muzzle of a handgun and like a marijuana pipe, a metal pipe that, based on my experience, is used to smoke marijuana.

---

[9] It is unclear if Sgt. Beidelschies knew about the pending ATF investigation on Idleman at this time or not, but even without that additional knowledge, the other circumstances justified the reasonable actions taken to ensure officer safety.

(ECF No. 635 at 31-32). It is apparent that whatever the length of time it took for Sgt. Beidelschies to walk from his patrol car to the Camry and open the passenger side door, it was clearly a matter of mere moments. In contrast to <u>Rodriguez'</u> holding that extension of a stop by "seven or eight minutes after the purpose of the traffic stop was complete" was unlawful, this negligible amount of time did not "prolong" the stop. <u>Id.</u> at *1616. ("The critical question, then is not whether the dog sniff occurs before or after the officer issues a ticket . . . but whether conducting the sniff "prolongs" i.e., adds time to - the stop."). Indeed, here, the K9 sniff was never even conducted as the contraband in plain view gave independent justification for all that followed.

Also of importance is the fact that here, unlike many of the cases otherwise on point, Idleman was not merely just being written a citation for the traffic violation and released to continue on his way. Rather, he was arrested on the felony warrant, no matter how the rest of the stop proceeded. Accordingly, once Idleman was arrested, the Camry could not have been released until Sgt. Beidelschies had, at minimum, obtained Ms. Herron's driver's license and confirmed its validity and her ability to legally drive the Camry away from the stop. Indeed, Sgt. Beidelschies testified that he would have indeed done so, had it gotten to that point:

> Q. And did you also ask the female for her driver's license information?
> A. I don't recall, but it would have been probably standard practice for me, if the driver does not have a driver's license, I typically ask the passenger if they would.
> Q. Okay. And you don't recall if you asked her?
> A. I don't recall.
> Q. But if there are no other issues, you had a valid driver in the passenger side, would you allow that passenger to leave following the traffic stop with the vehicle in the driver's seat, **if your passenger was a valid driver**?
> A. Yes, ma'am.
> Q. Okay. So let's say that you pull over a couple and -- for following too closely and the driver doesn't have a license but the passenger does. With no other problems, you're going to let them switch and move on about their way?
> A. Yes, ma'am. We would have -- **I would have issued some sort of traffic citation to the driver and allowed the passenger to take the car, yes**, that's true.

(ECF No. 635 at 42-43). As a result, the stop would have been extended long enough to check Herron's driver's license regardless of whether the officers had decided to deploy the K9 or not. Running her license would have certainly taken at least a few more minutes - far longer than it took for Sgt. Beidelschies to open the passenger door and observe the contraband in plain view.

For all of these reasons, the undersigned can find no point at which the stop was prolonged in violation of Idleman's Fourth Amendment rights. Moreover, even if the stop had been measurably extended after Idleman was in custody, the officers had separate and independent grounds to continue to detain the Camry long enough to conduct a K9 sniff, because there was reasonable suspicion of criminal activity.

**2. The officers had reasonable suspicion of criminal activity sufficient to justify the continued detention of the Camry.**

In the absence of consent to search, reasonable suspicion of a crime is necessary to extend a traffic stop for investigative purposes. United States v. Foreman, 368 F.3d 776, 782 (4th Cir. 2004). In the context of vehicle stops, it is well-settled that the 'reasonable suspicion' standard is not an onerous one. The reasonable suspicion standard is "less demanding [] than probable cause and requires a showing considerably less than preponderance of the evidence." Foreman, quoting Illinois v. Wardlow, 528 U.S. 119, 123 (2000). Courts look at the "totality of the circumstances" of each case, United States v. Arvizu, 534 U.S. 266, 273, 122 S.Ct. 744, 750 (2002) (overruled in part on separate grounds by Davis v. Washington, 547  U.S. 813 (2006)). for "'specific and articulable facts' demonstrat[ing] at least a minimum level of objective justification for [believing] that criminal activity is afoot." United States v. Branch, 537 F.3d 328, 337 (4th Cir. 2008), quoting Wardlow, 528 U.S. at 123. Factors that alone are consistent with innocent travel may, taken together, constitute reasonable suspicion. U.S. v. Sokolow, 490 U.S. 1, 9, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989).

Idleman argues that "Sgt. Beidelschies' decision to search was clearly made prior to locating ay contraband and was not based on any specific or articulable facts which would demonstrate that criminal activity was afoot." (ECF No. 567 at 5).

Idleman's first claim here, even if true, is of no consequence - officers' subjective states of mind are irrelevant to the inquiry. Wren, 517 U.S. at *806 ("this Court's cases foreclose the argument that ulterior motives can invalidate police conduct justified on the basis of probable cause . . . Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis.") (internal citation omitted). Moreover, Sgt. Beidelschies *was* in fact able to provide specific and articulable facts giving rise to reasonable suspicion that the vehicle was carrying contraband:

> Q.   Okay.  Now, at this point that you place Mr. Idleman in the backseat of your patrol vehicle, do you have any evidence or any reasonable suspicion that the vehicle that Mr. Idleman is driving in contains any type of contraband, weapons, or controlled substances? A.   I was concerned about that, yes, ma'am.  And I was basing that concern off of he was nervous, he had a recent gunshot wound which, based on my experience, typically people with recent gunshot wounds tend not to be upstanding citizens.  He had a felony warrant. And when I initially asked him about who his passenger was, he initially stated he didn't even know.  So based off of those, I was suspicious that there was some significant criminal activity afoot.

(ECF No. 635 at 46). These were in addition, of course, to the fact that when asked for his vehicle registration, Idleman had handed Sgt. Beidelschies instead a random piece of paper. (ECF No. 635 at 27) ("He provided me a piece of paper, but it wasn't the vehicle registration. It was some money order . . . It wasn't any of the required documents that I asked for.").

While mere ordinary nervousness *alone* would not support reasonable suspicion, as "[m]ost people when they are pulled over by the police are nervous," Branch, 537 F.3d at 346, unusual nervousness or nervousness in combination with other relevant factors can and often does. "[N]ervous, evasive behavior is a pertinent factor in determining reasonable suspicion," Illinois v. Wardlow, 528 U.S. 119, 124, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000), and this Court

18

has pointed to such behavior as contributing to reasonable suspicion in the context of traffic stops." United States v. Vaughan, 700 F.3d at 711 (4th Cir. 2012). This includes unusual nervousness. United States v. Mason, 628 F.3d 123, 129 (4th Cir. 2010). Other pertinent factors also include, notably applicable here, prior suspected criminal involvement, United States v. Driver, 513 Fed.App'x. 277, 2013 WL 781966 (4th Cir. 2013), cf. United States v. Powell, (potential prior criminal involvement of unknown recency was not sufficiently certain and could have been stale); inconsistencies in explanations and subsequent modifications of same, coupled with nervousness, Vaughan, 700 F.3d at 712; cf. United States v. Bowman, 884 F.3d 200, 216 (4th Cir. 2018) quoting Powell, 666 F.3d at 188-89 ("Although 'false statements can be considered in establishing reasonable suspicion,' 'a false statement, without more, will typically be insufficient.'"

Here, Idleman had a *confirmed, active, and valid* felony warrant out for his arrest, distinguishing his circumstances as far more sufficient for reasonable suspicion of involvement in criminal activity than those in both Powell and Driver. He had recently been shot, and provided no further explanation for this concerning fact. He purported to be visiting family, yet did not seem particularly familiar with the passenger accompanying him to an alleged family visit. He later corrected his statement after having recalled his passenger's name. And he appeared to Sgt. Beidelschies to be not just ordinarily nervous, but "very nervous" - moreso, in Sgt. Beidelschies' estimation, than the average driver he has pulled over. Accordingly, the OHSP officers here certainly had sufficient reasonable suspicion of criminal activity to justify the mere moments of additional detention that occurred.

### 3. Sgt. Beidelshies was under no obligation to let the passenger leave with the vehicle.

As best the court can interpret Idleman's motion in combination with counsel's cross-examination at the hearing, Idleman appears to suggest that Sgt. Beidelschies could have – and

should have – let Ms. Herron drive the vehicle away from the stop without attempting a K9 sniff, once Idleman was arrested on the felony warrant. However, Sgt. Beidelschies was under no obligation to do so. As this Court recently reiterated in U.S. v. Chiles, 2018 WL 1774556, Crim. No. 1:18-CV-7-1, ECF No. 68 at 17 (N.D. W.Va. Apr. 11 2018) (adopted in ECF No. 74, 2018 WL 1774557 (N.D. W.Va. Apr. 13, 2018)), law enforcement officers "[are] not required by the Fourth Amendment to give [a passenger] an opportunity to depart without first ensuring that, in so doing, [they] are not permitting a dangerous person to get behind [them]." Arizona v. Johnson, 555 U.S. 323, 324, 129 S.Ct. 781, 783 (2009).[10] And, reasonable suspicion that a vehicle may contain contraband - which existed here - extends equally to passengers in the vehicle. United States v. Sakyi, 160 F.3d 164, 169 (4th Cir. 1998). Accordingly, Sgt. Beidelschies was absolutely within his discretion not to release Herron and the Camry without first confirming or dispelling his suspicions.

**4.   The handgun and drug pipe were observed in plain view from a lawful vantage point, providing probable cause to conduct a warrantless search of the Camry under the Automobile Exception.**

In his motion, Idleman argues that "Sgt. Beidelschies did not have reasonable suspicion to search [the Camry]" (ECF No. 567 at 3). Idleman does not elaborate further as to why he believes this may be so. However, the undersigned cannot agree, for a number of reasons.

First, had Idleman been taken into custody for the traffic violation *alone*, the warrantless search of the vehicle would not have been authorized because the Camry did not, and could not, contain any evidence of "following too closely." However, Idleman's (apparent) argument fails

---

[10] "The temporary seizure of driver and passengers ordinarily continues, and remains reasonable, for the duration of the stop. Normally, the stop ends when the police have no further need to control the scene, and inform the driver and passengers they are free to leave . . . A reasonable passenger would understand that during the time a car is lawfully stopped, he or she is not free to terminate the encounter with the police and move about at will. Nothing occurred in this case that would have conveyed to Johnson that, prior to the frisk, the traffic stop had ended or that he was otherwise free "to depart without police permission." Brendlin, 551 U.S., at 257, 127 S.Ct. 2400. [The officer] was not required by the Fourth Amendment to give Johnson an opportunity to depart without first ensuring that, in so doing, she was not permitting a dangerous person to get behind her." Johnson at *324, **783.

to distinguish between the offense justifying the traffic stop (a misdemeanor traffic violation) and the offense for which Idleman was actually arrested (a felony). In Arizona v. Gant, the Supreme Court explained this distinction as it applies to warrantless vehicle searches incident to a lawful arrest:

> "Circumstances unique to the vehicle context justify a search incident to a lawful arrest when it is "reasonable to believe evidence relevant to the crime of arrest might be found in the vehicle." Thornton, 541 U.S., at 632, 124 S.Ct. 2127 (SCALIA, J., concurring in judgment). In many cases, as when a recent occupant is arrested for a traffic violation, there will be no reasonable basis to believe the vehicle contains relevant evidence. See, e.g., *344 Atwater v. Lago Vista, 532 U.S. 318, 324, 121 S.Ct. 1536, 149 L.Ed.2d 549 (2001); Knowles v. Iowa, 525 U.S. 113, 118, 119 S.Ct. 484, 142 L.Ed.2d 492 (1998). But in others, including Belton and Thornton, the offense of arrest will supply a basis for searching the passenger compartment of an arrestee's vehicle and any containers therein."

Arizona v. Gant, 556 U.S. 332, 343–44, 129 S. Ct. 1710, 1719 (2009).

At the time that the officers began to search the Camry, in addition to all of the above factors supporting reasonable suspicion to *detain* the Camry, Sgt. Beidelschies had further already observed a gun and drug pipe inside the car, in plain view. If Idleman intended to argue that all of these circumstances - including the gun and pipe - did not provide probable cause to search of the Camry, that argument obviously fails. (The undersigned also observes that although it is unclear at what precise moment the OHSP officers learned these additional pieces of information, the officers also discovered during the stop that Idleman had additionally recently been arrested in West Virginia, and was the subject of an ongoing ATF investigation.) As the Government correctly points out, the warrantless search of the Camry under these circumstances was clearly justified under the automobile exception.

"[W]here there [i]s probable cause to search a vehicle, 'a search is not unreasonable if based on facts that would justify the issuance of a warrant, *even though a warrant has not been actually obtained*.'" United States v. Ross, 456 U.S. 798, 809, 102 S.Ct. 2157 (1982) (emphasis in original). "Where police officers have probable cause to search an entire vehicle, they may

conduct a warrantless search of every part of the vehicle and its contents, including all containers and packages, that may conceal the object of the search. Id. at *799 (explaining that "the scope of the search is not defined by the nature of the container in which the contraband is secreted[; r]ather, it is defined by the object of the search and the places in which there is probable cause to believe that it may be found."). Moreover, it is well-established that "the 'automobile exception' has no separate exigency requirement." Maryland v. Dyson, 527 U.S. 465, 466, 119 S.Ct. 2013, 2014 (1999).

Probable cause exists when "the facts and circumstances within [the officers'] knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that" an offense has been - or is being - committed. Carroll v. United States, 267 U.S. 132, 162, 45 S.Ct. 280, 288 (1925). "Probable cause requires an officer to have a '*reasonable ground* for belief of guilt'—'more than bare suspicion.'" United States v. Ortiz, 669 F.3d 439, 446 (4th Cir. 2012) quoting  Brinegar v. United States, 338 U.S. 160, 175, 69 S.Ct. 1302, 1310 (1949) (emphasis in original).

Prior to searching the Camry, Sgt. Beidelshies had observed a handgun and a drug pipe in the passenger compartment of the vehicle; at least one of its recent occupants had been arrested on an active felony warrant and had recently been shot - in addition to appearing "very nervous." There was *ample* probable cause to believe that further contraband and evidence of a crime would be found in the vehicle, and the officers were thus authorized to search it without obtaining a warrant under Ross's automobile exception because the vehicle was readily mobile. In fact, as Idleman himself pointed out, the Camry could have been driven away by Ms. Herron after he was taken into custody. Accordingly, the officers were justified in searching inside the Camry without a warrant. Moreover, they were also justified in searching anywhere in the Camry that drugs or guns could be stored – including the locked box and the trunk.

**5.  The search of the locked box and the Camry's trunk was likewise authorized by the automobile exception.**

Probable cause to search a vehicle generally extends to "any containers therein," <u>Gant,</u> 556 U.S. at 343-44, so long as the object of the search could conceivably fit inside them. When probable cause exists "only [as] to a container within an automobile, [police] may search the *container* without a warrant where they have probable cause to believe that it holds contraband or evidence." <u>California v. Acevedo,</u>  500 U.S. 565, 111 S.Ct. 1982 (1991) citing <u>Carroll,</u> 267 U.S. at 45 S.Ct. at 543 (emphasis added). However, in contrast, a warrantless search of an automobile permissibly includes a search of closed containers found inside the car when there is probable cause to search the *vehicle*. <u>United States v. Ross,</u> 456 U.S. 798, 102 S.Ct. 2157, 72 L.Ed.2d 572.

"In <u>Chambers v. Maroney,</u> 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970), [the Supreme Court] held that when police officers have probable cause to believe there is contraband inside an automobile that has been stopped on the road, the officers may conduct a warrantless search of the vehicle, even after it has been impounded and is in police custody." <u>Michigan v. Thomas,</u> 458 U.S. 259, 261; 102 S.Ct. 3079, 3080 (1982). "The justification to conduct such a warrantless search does not vanish once the car has been immobilized; nor does it depend upon a reviewing court's assessment of the likelihood in each particular case that the car would have been driven away, or that its contents would have been tampered with, during the period required for the police to obtain a warrant." <u>Id.</u> at **3080-81.

Here, the officers had probable cause to believe that guns and drugs may be in the vehicle, but no particularized information to suggest *where* in the Camry such evidence would be found. Accordingly, probable cause extended to anywhere in the Camry where such evidence could have been stored, including the locked box and the trunk. It also extended, temporally,

after the vehicle was impounded. Accordingly, the search was permissible at the roadside, but would have been equally permissible after the Camry was impounded. Moreover, even in the absence of probable cause, an inventory search of the Camry pursuant to impound would have disclosed the same evidence regardless.

> **6. Because the Camry was impounded and an inventory search would have revealed the evidence seized from the Camry regardless, the doctrine of inevitable discovery provides an additional independent means by which the evidence would not be suppressed.**

Sgt. Beidelschies testified that at the conclusion of the stop, both Idleman and Herron were taken into custody, and thus, with no occupants left to drive, the Camry had to be – and was – impounded. (ECF No. 635 at 56). The undersigned has found no Fourth Amendment violations in the officers' conduct during the traffic stop and subsequent search. However, even if there were, the doctrine of inevitable discovery would prevent exclusion of evidence regardless.

"[I]nventory searches are now a well-defined exception to the warrant requirement of the Fourth Amendment . . . [ones which do not require] probable cause [by virtue of being] routine, noncriminal procedures." Colorado v. Bertine, 479 U.S. 367, 371, 107 S.Ct. 738, 741 (1987). Moreover, Ohio State Highway Patrol Policy 200.10 directs officers to conduct an inventory search of an impounded vehicle and any contents that are impounded with it, specifically including both the trunk and any "closed, locked, sealed, or taped containers." State v. Zeigler, 2016 WL 7496639, *4 (2017).[11] Because the applicable policy specifically and sufficiently regulates – and expressly directs – the opening of closed containers, see, e.g., United States v. Matthews, 591 F.3d 230, 238 (4th Cir. 2009) (inventory search exception applied and inventory search permissible where "the Department's policy authorizes the opening of closed containers encountered during an inventory search"), the undersigned is constrained to agree with the

---

[11] 5th Dist. Knox No. 16CA9, 2016-Ohio-8370.

Government that the evidence Idleman seeks to suppress would have ultimately been discovered by lawful means regardless.

The purpose of the exclusionary rule is to deter law enforcement from future Fourth Amendment violations. United States v. Rush, 808 F.3d 1007, 1010 (4th Cir. 2015). However, there are exceptions. Under the doctrine of inevitable discovery, evidence not otherwise lawfully obtained is admissible "[i]f the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means[.]" Nix v. Williams, 467 U.S. 431, 444 (1981). Having found that Sgt. Beidelschies was not required to permit Herron to depart with the Camry, that no Fourth Amendment violations occurred, that the Camry had to be impounded as all occupants of the vehicle were in custody, and that Ohio State Highway Patrol Policy 200.10 specifically directed an inventory of both the trunk and the locked box, the undersigned cannot reach any other conclusion except that the evidence would have been discovered by lawful means in any event.

### 7. Fifth Amendment grounds for suppression exist only for one of Idleman's statements (denying ownership of the locked box).

Having found no proper grounds for suppression of Idleman's statements on Fourth Amendment grounds, remaining is Idleman's argument for suppression on Fifth Amendment grounds – i.e., Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602. (1966) "The prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." Id. at *444, **1612. "Custodial interrogation" means "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." Id. at *444, **1612.

### a. While he was in custody and had not been Mirandized at the time he said it, Idleman's statement "God damn, there goes my whole load,"

**cannot be suppressed as there was no interrogation.**

It is not disputed that Idleman was in custody at the time the statement was made, and that Idleman had not been given Miranda warnings at the time he made this statement. Sgt. Beidelschies testified at the hearing that Idleman was not given Miranda warnings at any point during the traffic stop on I-70, as the OSHP officers did not conduct questioning of Idleman, with the exception of asking Idleman if the box in the Camry belonged to him during the search. (Idleman denied ownership in response to that question.) Rather, once Idleman was transported to the West Jefferson facility and turned over to officers trained in interrogation for that purpose, those officers provide Miranda warnings to Idleman prior to commencing questioning.

However, as Idleman apparently fails to appreciate, simply *making* a statement while in custody but not Mirandized does not entitle one to suppression. Indeed, doing so would ignore a key element of Miranda's holding "that when an individual is taken into custody or otherwise deprived of his freedom by the authorities . . . *and is subjected to questioning,* the privilege against self-incrimination is jeopardized." 384 U.S. 436, 478; 86 S.Ct. 1602, 1630 (1966) (emphasis added). Rather, the question is whether a Defendant - in custody but not yet Mirandized - has made statements *in response to interrogation by law enforcement,* since "[a]ny statement given freely and voluntarily without any compelling influences is, of course, admissible." Id. at *478, **1630.

While Idleman was in custody and had not been Mirandized at the time he said "God damn, there goes my whole load," that statement was not made in response to "questioning initiated by law enforcement officers." The statement was not even made *to* law enforcement (or anyone else, for that matter). Rather, that statement was spontaneously made by Idleman, who was alone in the patrol car, upon the officers' discovery of a substantial amount of money and

contraband during their search of the Camry. And, "[v]olunteered statements of any kind are not barred by the Fifth Amendment." Id. at *478, **1630.

Additionally, Idleman cites no case to support the notion that spontaneous statements made by a non-Mirandized defendant in custody can or should be suppressed on Fifth Amendment grounds. In fact, the opposite is well-established in numerous circuits, including the Fourth.

A defendant "d[oes] not have a reasonable expectation of privacy in a conversation in which he engaged while seated in the officer's patrol car." United States v. Fridie, 442 Fed. App'x. 839, 841; 2011 WL 3555432 at **1 (4th Cir. Aug. 12, 2011) (unpublished, per curiam) (citing United States v. McKinnon, 985 F.2d 525 (11th Cir. 1993) in declining to recognize a reasonable expectation of privacy in conversations that take place inside a police officer's patrol car). Moreover, a defendant who is detained in a police car while the officer(s) conduct a search of a stopped vehicle is "clearly not subjected to interrogation while in the car, [in which law enforcement officers are not present, and are accordingly] not entitled to Miranda rights. See Stanley v. Wainright, 604 F.2d 379, 382 (5th Cir. 1979), cert. denied, 447 U.S. 925 (1980)." United States v. Rodriguez, 998 F.2d 1011, 1993 WL 241764 at *2 (No. 92-5011, 4th Cir., Jul. 6, 1993).

> **b. "I don't have a version," and Idleman's statement that he was just told to drive the car should not be suppressed because they were made to law enforcement *after* Idleman was Mirandized.**

This statement, on the other hand, was made by Idleman in response to questioning by the investigators after he had been transported to a law enforcement facility following the conclusion of the stop. However, Sgt. Beidelschies testified these investigators – unlike the OHSP officers at the scene of the search along I-70 - *did* provide Idleman with Miranda

warnings prior to questioning him.[12]   Moreover, Idleman has not disputed this. Accordingly, Defendant's argument as to this point fails.

The undersigned notes that the Government indicated that it would not use this statement at trial (ECF No. 595 at 1), which would appear to render the issue moot. However, the undersigned can find no basis for suppressing this statement, either. Accordingly, Defendant's motion as to this point should nonetheless be denied.

> **c.   Idleman's denial of ownership of the locked box in the Camry and any other statements made *in response to questioning* from the OHSP Officers/Troopers prior to his being Mirandized should be suppressed.**

To the undersigned's knowledge, the *only* statement at issue made by Idleman while in custody, in response to law enforcement questioning, and prior to receiving Miranda warnings, was that the box in the Camry did not belong to him.[13] That statement is therefore the only identified statement that warrants suppression. However, because Idleman's motion requests that "all" statements be suppressed, and only a few statements are specifically identified by the parties; coupled with the fact that the Court is not privy to discovery - out of an abundance of caution, any other statements made by Idleman *in response to law enforcement questioning* prior to his being Mirandized would likewise warrant suppression, if any others exist.

## IV.   CONCLUSION

For the foregoing reasons, the undersigned finds that:

1. Sgt. Beidelschies' observation of Idleman's traffic violation - following too closely pursuant to Ohio Revised Code § 4511.34 – provided sufficient probable cause to stop the Camry;

---

[12] Motion hearing at 2:28:55 – 2:29:07.
[13] Motion hearing at 2:28:47 – 2:29:27.

2.  The stop was not prolonged beyond the time it should have reasonably concluded; and even if that were not the case, there was reasonable suspicion to detain it long enough to investigate further;

3. The officers had probable cause to search the Camry, and likewise had probable cause to search the locked box and the trunk without a warrant pursuant to the Automobile Exception;

4.  Accordingly, *no* statements or evidence should be suppressed on Fourth Amendment grounds;

5. The statement "God damn, there goes my whole load" should not be suppressed on Fifth Amendment grounds because, while Idleman was in custody and had not been given Miranda warnings at that time, it was spontaneously made by Idleman in the absence of any questioning by law enforcement;

6.  The statements "I don't have a version," and that "[Idleman] was just told to drive the car" should not be suppressed on Fifth Amendment grounds because it they were made *after* Idleman was Mirandized; and

**7.**  The statement made by Idleman denying ownership of the box should be suppressed on Fifth Amendment grounds, as it was made in response to a question from the officers, while Idleman was in custody, prior to being Mirandized.

## V.    RECOMMENDATION

Accordingly, the undersigned **RECOMMENDS** that Idleman's motion to suppress (ECF No. 567) and supplemental motion to suppress evidence (ECF No. 588) be **GRANTED in part as to Idleman's statement denying ownership of the locked box**, but **DENIED as to all other statements and evidence.**

29

Any party may, within fourteen (14) days after being served with a copy of this Report and Recommendation file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should also be submitted to the Honorable John Preston Bailey, United States District Judge. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation.  28 U.S.C. § 636(b)(1); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); Thomas v. Arn, 474 U.S. 140 (1985).

The Clerk of Court is **DIRECTED** to transmit copies of this Report and Recommendation to counsel of record.

Respectfully submitted July 16, 2018.

MICHAEL JOHN ALOI
UNITED STATES MAGISTRATE JUDGE